NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| THERAPEUTICSMD, INC. and MAYNE PHARMA LLC., <br><br> Plaintiffs, <br><br> v. <br><br> TEVA PHARMACEUTICALS USA, INC., <br><br> Defendant. | Case No. 2:20-cv-03485 (BRM) (SDA) (consolidated) <br><br> **OPINION** |

**MARTINOTTI, DISTRICT JUDGE**

Before this Court are competing applications by Plaintiffs TherapeuticsMD Inc. and Mayne Pharma LLC (collectively, "TherapeuticsMD") and Defendant Teva Pharmaceuticals USA, Inc. ("Teva"), to resolve disputes over several claim terms in U.S. Patent Nos. 9,180,091 ("the '091 patent"), 9,289,382 ("the '382 patent"), 10,258,630 ("the '630 patent"), 10,398,708 ("the '708 patent"), 10,471,072 ("the '072 patent"), 10,537,581 ("the '581 patent"), 10,568,891 ("the '891 patent"), 10,668, 082 ("the '082 patent"), 10,806,697 ("the '697 patent"), 10,835,487 ("the '487 patent"); 10,888,516 ("the '516 patent"); 11,065,197 ("the '197 patent"); 11,116,717 ("the '717 patent"); 11,123,283 ("the '283 patent"); 11,241,445 ("the '445 patent"); 11,246,875 ("the '875 patent"); 11,266,661 ("the '661 patent"); 11,304,959 ("the '959 patent"); 11,351,182 ("the '182 patent"); and 11,497,709 ("the '709 patent") (collectively, the "patents in suit"). (ECF Nos. 84,

85.)[1] Both TherapeuticsMD and Teva request the Court to find the proper construction of the following terms:

1)  Does Not Include a Hydrophilic Gel-Forming Bioadhesive Agent

2)  Does Not Include an amount of a Hydrophilic Gel-Forming Bioadhesive Agent that Increases the Viscosity Above About 1000 cP at 25º C

3)  The "Mean Area Under the Curve $(AUC)_{0-24}$ of 17β-estradiol of about [X] pg*hr/ml to about [Y] pg*hr/ml"

4)  Corrected Geometric Mean

(Teva's Op. Br. (ECF No. 84) at 4–5; TherapeuticsMD's Op. Br. (ECF No. 85) at vii–x.)

The parties each submitted a brief in response to the other's opening arguments. (TherapeuticsMD's First Res. Br. (ECF No. 103); Teva First Res. Br. (ECF No. 104).) The parties then submitted additional opening briefing to the court requesting two additional terms be construed:

5)  Solvent System

6)  Shape of a Tear Drop

(Teva's Second Op. Br. (ECF No. 179) at 4 & 9; TherapeuticsMD's Second Op. Br. (ECF No. 180) at 4 & 11.) The Court conducted a *Markman* hearing on October 5, 2025, where the parties presented arguments pertaining each of the disputed terms. (*Markman* Hearing Tr. (ECF No. 206).) At the close of the hearing, the parties mutually requested leave to file supplemental briefing in light of the hearing, which the Court granted. (*Id.* at 76:2–21). The parties timely submitted supplemental briefing on October 27, 2025, which the Court has considered. (TherapeuticsMD's Supp. Br. (ECF No. 208); Teva's Supp. Br. (ECF No. 207).) For the reasons set forth below in this Opinion, this Court defines the six disputed terms as follows: (1) "Does Not Include a Hydrophilic

---

[1] Unless otherwise stated, ECF numbers refer to Case No. 2:20-cv-03485.

Gel-Forming Bioadhesive Agent" shall mean "does not include an agent that is hydrophilic, functions to form a gel, and functions as a bioadhesive;" (2) "Does Not Include an amount of a Hydrophilic Gel-Forming Bioadhesive Agent that Increases the Viscosity Above About 1000 cP at 25º C" shall be interpreted to share the same definition as "does not include an agent that is hydrophilic, functions to form a gel, and functions as a bioadhesive;" (3) the "Mean Area Under the Curve (AUC)$_{0\text{-}24}$ of 17β-estradiol of about [X] pg*hr/ml to about [Y] pg*hr/ml" shall mean "corrected geometric mean Area Under the Curve (AUC)$_{0\text{-}24}$ of 17β-estradiol of about [X] pg*hr/ml to about [Y] pg*hr/ml," (4) "Corrected Geometric Mean" shall carry its plain and ordinary meaning, without constraint to a single patient; (5) "Solvent System" means a "composition of non-toxic, pharmaceutically acceptable solvents, co-solvents, and surfactants suitable for vaginal delivery or absorption;" and (6) "Shape of a Tear Drop" shall carry its plain and ordinary meaning, of a shape with a globular form, tapering toward the other end.

## I.    BACKGROUND

### A.    Factual Background

TherapeuticsMD is a pharmaceutical company, and the owner of a brand-name vaginal suppository estradiol supplement named Imvexxy®. (ECF No. 85 at 3). Imvexxy® is used to treat vulvovaginal atrophy ("VVA"), a condition characterized by dryness, itching, soreness, irritation, bleeding, and painful sexual activity and is most commonly experienced by post-menopausal people. (*Id.* at 2.) VVA is commonly treated by use of topical estrogen-based therapies in the form of gels, creams, or vaginally-inserted tablets. (*Id.*) Yet, according to TherapeuticsMD, these common treatments "suffered from a number of drawbacks," for instance "gels and creams may rub, wear or wash off before the estrogen is fully absorbed" and "[t]ablet inserts may not fully dissolve and lead to unpleasant vaginal discharge." *Id.*

3

Responding to these drawbacks, prior art included "capsule formations" which relied on "hydrophilic gel-forming bioadhesive agent[s]" to apply the proper dose of hormones. These agents required "sufficient water/moisture to function properly," which is not always possible for women experiencing VAA, because "patients often suffer from vaginal dryness." (*Id.*)

TherapeuticsMD contends that Imvexxy® does not rely on these agents and therefore represents a step forward in the treatment of VVA, because it "overcame the drawbacks of existing VVA treatments," and "safely and effectively delivers low doses of estradiol . . . with an improved pharmacokinetic profile and greater patient compliance." (*Id.* at 3.) Under 21 U.S.C. § 355, the Hatch-Waxman Act, manufacturers are required to inform the FDA by listing in their Orange Book any patents covering the product, so generic companies can assess whether to challenge infringement and/or validity of the patents. *See* 21 U.S.C. § 355(b)(1)(A). TherapeuticsMD properly registered Imvexxy® with the FDA as covered by twenty (20) patents, which TherapeuticsMD now seeks to enforce against Teva. (Second Joint Claim Construction Statement (ECF No. 176) at 1–2.)

Teva is a leading manufacturer of generic drugs. (Compl. (ECF No. 1) ¶ 6; Teva's Answer to Complaint (ECF No. 10) ¶ 6.). The Hatch-Waxman requires brand-name manufacturers to list all patents which cover their products and also requires generic manufacturers insure their products do not infringe the valid patents of the brand-name manufacturer. *F.T.C. v. AbbVie, Inc.*, 976 F.3d 327, 339 (3d Cir. 2020). Here, Teva filed an abbreviated new drug application, ANDA No. 214137, on February 18, 2020, which certified its new generic product—despite being therapeutically similar to Imvexxy®—would not infringe any of the Imvexxy® Patents. (ECF No. 1 ¶ 17; ECF No. 10 ¶ 17.) At the same time, Teva sent a notice letter to TherapeuticsMD, providing notice Teva was seeking approval of a similar "Estradiol Vaginal Insert . . . before the expiration of the

4

[Imvexxy® Patents]" on the basis the patents "are invalid, unenforceable, and/or will not be infringed by . . . Defendants' ANDA Product." (*Id.* ¶¶ 17 & 30.) Under Hatch-Waxman, the filing of ANDA 214137 is, itself, an act of infringement and TherapeuticsMD timely filed suit requesting declaratory judgment that "the commercial manufacture, use, offering to sell, or sale within the United States, and/or importation into the United States, of Teva's ANDA Product before the expiration of the [Imvexxy® Patents] would directly and/or indirectly infringe the [patents]," alongside other forms of relief. (ECF No. 1 ¶¶ A–KK.)

Pursuant to this ongoing litigation, the parties request the Court to construe a series of claim terms alleged to cover the patents-in-suit. First, pharmaceuticals contain inactive ingredients or "excipients," which do not directly treat a given condition but may assist with administration, uptake, duration, or otherwise benefit the patient, healthcare provider, or manufacturer in some way. (ECF No. 84 at 2; ECF No. 85 at 8.) The parties contest the meaning of a series of claim terms governing the meaning of two categories of excipients: "hydrophilic gel-forming bioadhesive agent[s]," which the patents expressly exclude; and the "solvent system," which would solubilize formulation. TherapeuticsMD contends a "hydrophilic gel-forming bioadhesive agent," is a functional term—the patent disclaims the presence of an excipient "that actually functions to form a gel and actually functions as a bioadhesive in the context of the formulation." (ECF No. 85 at 8.) Teva disagrees and contends the phrase "hydrophilic gel-forming bioadhesive agent" refers to a specific set of compounds present in a prior art reference, which the current patents exclude—and therefore a formulation containing any amount of those compounds falls outside the scope of the claims. (ECF No. 84 at 9.) As for the "solvent system," the question is substantively similar—whether the term "solvent system" is a functional claim. Teva argues this is a functional claim so the system is a composition "that performs the function of solubilizing the

5

active ingredient—here, estradiol." (ECF No. 179 at 10.) Whereas, TherapeuticsMD argues this is a structural claim that includes "other excipients," not just the solvents. (ECF No. 180 at 4.)

Second, the parties dispute claim terms governing how the target level of estradiol in patients should be measured. (ECF No. 84 at 25; ECF No. 85 at 20.) Here, there are a number of claims referring to the "mean area under the curve" measured after the administration of the estradiol tablet insert. (ECF No. 84 at 27; ECF No. 85 at 25.) The parties dispute whether "mean" should be interpreted to carry its plain and ordinary meaning, also known as the "arithmetic mean," (ECF No. 84 at 27) or if "mean" instead refers to the "corrected geometric mean." (ECF No. 85 at 25.) Although other claims expressly refer to the "corrected geometric mean," Teva argues "mean" should refer to the corrected geometric mean, which is "calculated based on a single administration to a single patient." (ECF No. 84 at 25.)

Finally, the parties dispute the form-factor of the treatment. (ECF No. 179 at 2; ECF No. 180 at 11.) Though the parties agree the U.S. Patent Nos. 10,888,516; 11,065,197; 11,116,717; and 11,123,283 claim the "shape of a teardrop," which the parties agree includes a "globular form" which "taper[s] towards the other end," Teva contends a teardrop must "taper[] to a point," whereas TherapeuticsMD believes that the claims encompass a rounded end, so long as the shape is tapered. *Id.*

## B. Procedural Background

On April 1, 2020, TherapeuticsMD filed the first of several complaints against Teva, alleging Teva, in filing ANDA 214137 before the expiration of the Imvexxy® Patents, infringed five patents under Hatch-Waxman. (ECF No. 1 ¶ 19). Teva answered the complaint on June 15, 2020, and asserted its own counterclaims—seeking a declaration of invalidity on each asserted patent. (ECF No. 10 ¶¶ 30–92.) Three months later, TherapeuticsMD filed the second action

against Teva, alleging ANDA 214137 infringed two additional patents. *TherapeuticsMD, Inc. v. Teva Pharms. USA, Inc.*, Civ. A. No. 20-8809 (D.N.J. Aug. 14, 2020). (Civ. A. No. 20-08809, ECF No. 1 ¶ 1.)

As more of TherapeuticMD's patents allegedly covering Imvexxy® were granted, TherapeuticsMD returned to the court and brought five additional actions against Teva for violation of same. On August 21, 2020, TherapeuticMD filed the third action alleging infringement of the '082 Patent. (Civ. A. No. 20-11087, ECF No. 1 ¶ 1.) In November 2020, Therapeutics brought an action for infringement of the '697 and '487. (Civ. A. No. 20-17496, ECF No. 1 ¶ 1.) In June 2021, TherapueticsMD brought its next complaint, alleging infringement of U.S. Patent No. 10,888,516. (Civ. A. No. 21-12794, ECF No. 1 ¶ 1.) In 2024, three years later, TherapeuticsMD brought the last two complaints alleging the full suite of patents currently at issue. (Civ. A. No. 24-07974, ECF No. 1 ¶ 1); TherapeuticsMD's Seventh Action Complaint (Civ. A. No. 24-11161, ECF No. 1 ¶ 1.)

In response to the six additional complaints, Teva put forward substantially similar answers, alongside counterclaims, requesting a determination that every patent-in-suit be found invalid. (*See, e.g.*, Civ. A. No. 20-8809, ECF No. 12; Civ. A. No. 20-11087, ECF No. 11; Civ. A. No. 20-17496 ECF No. 14; Civ. A. No. 24-7974, ECF No. 11.)

After all the applicable patents were granted, the parties jointly moved to consolidate the seven actions, which the Court granted. (Orders Consolidating Cases (ECF Nos. 33, 43, 51, 149).) After the actions were consolidated, TherapeuticsMD answered Teva's counterclaims from the consolidated suits. (ECF Nos. 52, 56, 152, 153, 158, 159.)

Recently in *TherapeuticsMD, Inc., et al. v. Sun Pharmaceutical Industries Ltd., et al.*, Civ. A. No. 24-cv-7974 (D.N.J. 2024), TherapeuticsMD moved to consolidate the action against Sun

7

Pharmaceutical Industries Ltd. and Sun Pharmaceutical Industries, Inc. (collectively, "Sun") into this consolidated action. (Civ. A. No. 24-07974, ECF No. 67 at 1.) TherapeuticsMD accuses Sun of infringing the same patents through Sun's own ANDA. (TherapeuticsMD's Complaint against Sun (Civ. A. No. 24-07974, ECF No. 1) ¶ 19.) Sun consented to consolidation (Civ. A. No. 24-07974, ECF No. 70) and adopted Teva's constructions. (Sun *Markman* Br. (Civ. A. No. 24-07974, ECF No. 51) at 1.) Therefore, Sun will be equally bound by the Court's decision in this *Markman* opinion. (*Id.*)

The parties filed *Markman* briefs before the court, alongside a joint *Markman* statement, clarifying which terms at issue were most important, and laying out the parties' competing interpretations. (First Joint Claim Construction Statement (ECF No. 79); ECF Nos. 84, 85.) The parties each set forth timely response briefs in June 2021 in preparation for a *Markman* hearing. (See ECF Nos. 103, 104.) However, before a *Markman* hearing could be taken, the parties jointly moved to stay the case on July 26, 2021. (Order Granting a stay of Consolidated Actions (ECF No. 119).)

Last year, the parties agreed to lift the stay and resume litigation. (ECF No. 139.) However, in that time, claim terms from newly granted patents came into controversy. (Second Joint Claim Construction Statement (ECF No. 176) at 5–6.) The parties again put forward *Markman* briefs, each arguing for its respective interpretation of the new claim terms. (ECF Nos. 179, 180.) After the parties filed their respective response briefs (ECF Nos. 185, 186), the Court held a *Markman* hearing on October 5, 2025, to consider the parties' arguments in full. (ECF No. 206.)[2] At the close of the hearing, the Court granted leave for the parties to file supplemental briefing of up to

---

[2] At the *Markman* hearing, the parties each provided the Court explanatory PowerPoint presentations, which it considered along with the briefing. (ECF No. 206 at 4.)

five pages. (*Id.* at 76:2–21). The parties timely submitted supplemental briefing on October 27, 2025. (ECF Nos. 207, 208.)

## II.   LEGAL STANDARD

Claims define the scope of the inventor's right to exclude. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). Claim construction determines the correct claim scope and is a determination exclusively for the court as a matter of law. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978–79 (Fed. Cir. 1995) (*en banc*). Indeed, the court can only interpret claims, and "can neither broaden nor narrow claims to give the patentee something different than what it has set forth" in the specification. *E.I. Du Pont de Nemours v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1998). A court's determination "of patent infringement requires a two-step process: first, the court determines the meaning of the disputed claim terms, then the accused device is compared to the claims as construed to determine infringement." *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 804 (Fed. Cir. 2007).

This interpretive analysis begins with the language of the claims, which is to be read and understood as it would be by a person of ordinary skill in the art ("POSA"). *Dow Chem. Co. v. Sumitomo Chem Co.*, 257 F.3d 1364, 1372 (Fed. Cir. 2001); *see also Markman*, 52 F.3d at 986 ("The focus [in construing disputed terms in claim language] is on the objective test of what one of ordinary skill in the art at the time of invention would have understood the term[s] to mean."); *Phillips*, 415 F.3d at 1312–13. In construing the claims, the court may examine both intrinsic evidence, e.g., the patent, its claims, the specification, and the prosecution history, and extrinsic evidence, e.g., expert reports and testimony. *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1309 (Fed. Cir. 1999).

The analysis of claim language begins with determining the "ordinary and customary meaning of a claim term[, which] is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313. Further, the language should not be read solely in the context of the claim under review; instead, it should be analyzed "in the context of the entire patent" and with an understanding of how that language is used in the field from which the patent comes. *Id.* In conducting this review, a different interpretation is placed on a term located in an independent claim than on those located in dependent claims, and it is understood that each claim covers different subject matter. *Saunders Grp., Inc. v. Comfortrac, Inc.*, 492 F.3d 1326, 1331 (Fed. Cir. 2007) (quoting *Phillips*, 415 F.3d at 1315 (holding that the "presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim")).

To review the language in this manner, "the court starts the decisionmaking process by reviewing the same resources as would [a person or ordinary skill in the art in question], *viz.*, the patent specifications and the prosecution history." *Phillips*, 415 F.3d at 1313 (quoting *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998)). When "the ordinary meaning of claim language as understood by a person of skill in the art [is] readily apparent," understanding claim construction "involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314. "In such circumstances, general purpose dictionaries may be helpful" to explain the terms used. *Id.*

However, when the ordinary meaning of a term is not apparent, courts look to "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean." *Id.* Those sources may include "the words of the claims

10

themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* Furthermore, claims must be read in view of the claim specification, which is of seminal importance in providing framework for understanding the claim language. As the Federal Circuit in *Markman* explained:

> The specification contains a written description of the invention that must enable one of ordinary skill in the art to make and use the invention. For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims. As we have often stated, a patentee is free to use his [or her] own lexicographer. The caveat is that any special definition given to a word must be clearly defined in the specification. The written description part of the specification itself does not delimit the right to exclude. That is the function and the purpose of the claims.

*Markman v. Westview Instruments*, 52 F.3d 967, 979–80 (Fed. Cir. 1995) (*en banc*), *aff'd*, *Markman*, 517 U.S. 370.

This Court's reliance on the specification is appropriate given the Patent and Trademark Office's rules, which require:

> application claims must 'conform to the invention as set forth in the remainder of the specification and the terms and phrases used in the claims must find clear support or antecedent bases in the description so that the meaning of the terms in the claims may be ascertainable by reference to the description

*Phillips*, 415 F.3d at 1316–17 (quoting 37 C.F.R. § 1.75(d)(1)). During this analysis, however, courts should not "import limitations from the specifications into the claims." *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1370 (Fed. Cir. 2008) (quoting *CollegeNet, Inc. v. ApplyYourself, Inc.*, 418 F.3d 1225, 1231 (Fed. Cir. 2005)).

The patent's prosecution history is also of "primary significance in understanding the claims." *Markman*, 52 F.3d at 980. "The prosecution history can often inform the meaning of the

11

claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317. The prosecution history is also relevant to determining whether the patentee disclaimed or disavowed the subject matter, thereby narrowing the scope of the claim terms. *Seachange Int'l, Inc. v. C-Cor Inc.*, 413 F.3d 1361, 1372–73 (Fed. Cir. 2005).

In addition to intrinsic evidence, a court may also rely on extrinsic evidence in interpreting a claim. *Phillips*, 415 F.3d at 1317. Extrinsic evidence consists of "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id.* (internal quotation marks omitted). However, while extrinsic evidence "can shed useful light on the relevant art," it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id.* Extrinsic evidence should be "considered in the context of the intrinsic evidence," as there are flaws inhering in the exclusive reliance on extrinsic evidence, including, *inter alia*, biases, inadvertent alterations of meanings, and erroneous contextual translations. *Id.* at 1318–19. Furthermore, extrinsic evidence should not be relied upon where "an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).

## III.   DECISION

### A.  Does Not Include a Hydrophilic Gel-Forming Bioadhesive Agent

The primary dispute between the parties is whether the terms "hydrophilic gel-forming bioadhesive agent" and "does not include a hydrophilic gel-forming bioadhesive agent" refer to a purely structural limitation, or if it encompasses both structural and functional elements. The claims at issue appear in the '091, '581, '891, and '697 patents. Teva suggests these limitations

are wholly structural and excludes formulations which contain any amount of an ingredient known to have these properties. (Teva's Op. Claim Construction Br. (ECF No. 84) at 6–7.) TherapeuticsMD contends that the term "agent" connotes a functional limitation, because even if an ingredient "possesses abstract or potential gel-forming and bio-adhesive properties" it is not an "agent" if present only in minute quantities or otherwise does not actually function as a gel-forming or bioadhesive agent "in the context of the formulation." (TherapeuticsMD's Op. Claim Construction Br. (ECF No. 85) at 18–19.)

Before determining the meaning of the claim term, the court must decide whether the terms are to be construed together, or—as TherapeuticsMD suggests—there should be a separate, albeit similar, construction for each of the four patents. In theory, this would account for the different delivery vehicles claimed, such as a vaginal suppository, pessary, or liquid vaginal composition. (*Id.* at 17.) Despite this request, TherapeuticsMD "agree[s] that the term should be construed consistently across all of the asserted patents." (*Id.* At 16.) Given that this is a limiting claim, and there is no indication the absence of a hydrophilic gel-forming bioadhesive agent has a different effect on different delivery vehicles, there is no additional clarity provided by multiple constructions. The Court will therefore construe all instances of "hydrophilic gel-forming bioadhesive agent" or "does not include a hydrophilic gel-forming bioadhesive agent" together.

The parties have agreed to use claim 1 of the U.S. Patent No. 9,180,091 as an example for construction. It reads:

1. A vaginal suppository comprising:

   a. a therapeutically effective amount of estradiol; and

   b. a solubilizing agent, wherein the solubilizing agent comprises at least one C6-C12 fatty acid or a glycol, monoglyceride, diglyceride, or triglyceride ester thereof;

13

> wherein the vaginal suppository comprises from about 1 micrograms to about 25 micrograms of estradiol;
>
> wherein estradiol is the only active hormone in the vaginal suppository; and
>
> **wherein the vaginal suppository does not include a hydrophilic gel-forming bioadhesive agent in the solubilizing agent**

(*See* ECF No. 85 at 3; *see also* ECF No. 84 at 6–7); '091 Patent col. 14 ll. 53–65.

Teva contends the plain and ordinary meaning of "does not include" is that certain substances are entirely absent, namely a series of excipients listed in the specification. (ECF No. 84 at 7.) Despite claim language specifically excluding this category of excipients, formulations which do contain hydrophilic gel-forming, bioadhesive excipients would be found to infringe if the Court were to apply a functional reading. To provide an alternative, Teva cites to the specification of the '091 patent and the prosecution histories of all patents at issue. (Teva Op. Br. Exs. 5, 6, & 7 (ECF No. 84-6 at 7, 78, and 181).)

Specifically, Teva cites to the '091 specification, reciting "carboxyvinylic acid, hydroxypropylcellulose; carboxymethyl cellulose; gelatin; xanthane gum [*sic*]; guar gum; aluminum silicate; or mixtures thereof," as a list of exemplary agents which are not included in the formulation. '091 patent col. 5 ll. 1–5. This list appears across multiple patents and, as Teva points out, is "the only discussion in the specification about what constitutes a hydrophilic gel-forming bioadhesive agent in the context of the claimed invention," and is therefore highly instructive of the identity of the excipients TherapeuticsMD sought to exclude. (Teva's Res. Claim Construction Br. (ECF No. 104) at 12.)

TherapeuticsMD's argument to the contrary is relatively straightforward—the word "agent expressly denotes function," not simply an ingredient. (ECF No. 103 at 3.) This interpretation is supported by case law, as Courts have often found the term "agent" to claim substances with "a

causal relationship . . . [between the] agent and the act." *Takeda Pharm. Co. v. Teva Pharms. USA, Inc.*, 668 F. Supp. 2d 614 (D. Del. 2009), *aff'd*, 363 F. App'x 34 (Fed. Cir. 2010) (finding "excipients that facilitate disintegration, but are not known in the art to cause disintegration" were not "disintegrating agents"). "For a substance to be an 'agent,' that substance—what it is, how much of it is present—must cause a specific result, *not merely be capable of doing so if greatly increased in quantity.*" *Liqwd, Inc. v. L'Oreal USA, Inc.*, 720 F. App'x 623 (Fed. Cir. 2018) (emphasis added). Put simply, for a substance to be an "agent," quantity and context matter.

The prosecution history of TherapeuticsMD's patents is not to the contrary. While pursuing the patents at issue, TherapeuticsMD faced rejection over a prior art reference from U.S. Patent No. 6,060,077, which the parties refer to as "Meignant." (ECF No. 84 at 9; ECF No. 85 at 12.) The Meignant reference also claimed an estradiol therapy for menopausal women. Meignant col. 7 ll. 25–36. Where Meignant differed was that it employed hydrophilic gel-forming bioadhesive agents, which would interact with the patient's mucous to adhere to the walls of the treatment area. *Id.* at col. 2 l. 13–21 col. 8 ll. 31–35. When TherapeuticsMD faced rejection of its patent application over Meignant, it amended its claims and specification to disclaim use of the same set of hydrophilic gel-forming bioadhesive agents Meignant employed in its treatment. (Teva Op. Br. Ex. 6 (ECF No. 84–6) at 33.)

This point is not dispositive. There is no dispute the claims in question exclude the use of specific agents, and that these claims were included to distinguish Meignant. (TherapeuticsMD Res. Br. (ECF No. 103) at 6.) However, Meignant does not compel a structural reading of the term agent. In a different claim, Meignant has a structural claim for a specific embodiment, including a specified amount of one of the agents at issue (hydroxypropylcellulose). Meignant col. 8 ll. 10–20. Despite this, Meignant separately claims an entire category of excipients as potential agents.

15

*See id.* col. 7–8, ll. 57–3. However, here the patents do not claim any amount of the alternative ingredients suggesting instead that it claims whatever amount is necessary for it to serve as an "agent." *Id.* Indeed, the Meignant specification discusses the agents specifically in terms of its functions within the medicament: to "emulsify, enabling direct passive diffusion" and allowing "the emulsion to adhere to the mucous membrane with a slight flow." *Id.* col. 2 ll. 13–2. The Court reads this as a functional limitation; Meignant was not claiming the mere presence of the listed compounds, but enough of those compounds to have the claimed effect.

Notably, Teva has elsewhere recognized that the term "agent" is reserved for a substance that performs a given function. In the Second Joint Claim Construction Statement the parties agreed the other agent within the exemplary '091 claim, the "solubilizing agent," should be construed as "an agent or combination of agents *that solubilize* an active pharmaceutical ingredient." (Second Joint Claim Construction Statement (ECF No. 176) at 2); *see also, e.g.*, '091 Patent col. 14 ll. 55. But if a potential solvent is only present in trace amounts, it cannot actually solubilize another ingredient and therefore is not a solubilizing agent. "We presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning." *Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003).

Consistent with the prior definition of agent within these patents and case law, the Court adopts TherapeuticsMD's preferred construction of "does not include a hydrophilic gel-forming bioadhesive agent," to mean "does not include an agent that is hydrophilic, functions to form a gel, and functions as a bioadhesive."

### B. Does Not Include an amount of a Hydrophilic Gel-Forming Bioadhesive Agent that Increases the Viscosity Above About 1000 cP at 25º C

16

The Court turns now to the unique claim language of the '697 Patent, which would—rather than exclude all hydrophilic gel-forming bioadhesive agents—expressly allow some use of these gel-forming agents so long as they do not reach a specific viscosity threshold. (ECF No. 85 at 3.) However, TherapeuticsMD had previously disclaimed any use of hydrophilic gel-forming bioadhesive agents in order to gain approval over the Meignant reference.

While the Court agrees TherapeuticsMD did not disclaim the mere presence of "immaterial amounts" of hydrophilic compounds with gel-forming and bioadhesive properties, this amendment would allow for material amounts of these excipients to be added. (ECF No. 103 at 7.) Though Meignant did employ these excipients as active agents, they were included as part "liquid or semi-liquid inner phase," which encompasses liquids below 1000 cP at 25º C. Meignant col. 2 ll. 31–33.

TherapeuticsMD's initial disclaimer before the patent office was absolute—but this amendment now allows both to use of hydrophilic gel-forming bioadhesive agents. (*See* Teva First *Markman* Br. Ex. 8 (ECF No. 84-6) at 104–05.) These agents may also have substantial effect: increasing the viscosity of the formulation to its typical target level "between 50 and 1000 cP." '697 Patent col 22, ll. 44–45. The specification further makes clear this formulation may make use of some of the compounds which could potentially serve as gel-forming agents as "thickening agents," namely xanthan gum and gelatin. *Id.* col. 17, ll. 27–30; *but see id.* col. 21, ll. 19–22 (forbidding the use of these compounds as hydrophilic gel-forming bioadhesive agents).

In short, the '697 patent is attempting to recapture some of the claim scope surrendered in prosecution. "Although a disclaimer made during prosecution can be rescinded, permitting recapture of the disclaimed scope, the prosecution history must be sufficiently clear to inform the examiner that the previous disclaimer, and the prior art that it was made to avoid, may need to be

17

re-visited." *Hakim v. Cannon Avent Grp., PLC*, 479 F.3d 1313 (Fed. Cir. 2007) (citing *Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989 (Fed. Cir. 2003)); *see also Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362 (Fed. Cir. 2014) ("Although our precedent allows applicants to rescind a disclaimer during prosecution [patentee] did not avail itself of this route and never notified the PTO that it sought a meaning [broader than previously disclaimed] . . . ."). Here, TherapeuticsMD does not argue it made this disclaimer, rather its argues that such disclaimer was unnecessary because the patent office ultimately withdrew the objection. (ECF No. 103 at 8.)

The fact the patent office ultimately withdrew its prior art objections over Meignant is immaterial. (ECF No. 103 at 8.) "[T]here is no principle of patent law that the scope of a surrender of subject matter during prosecution is limited to what is absolutely necessary to avoid a prior art reference*." Norian Corp. v. Stryker Corp.*, 432 F.3d 1356, 1361 (Fed. Cir. 2005).

The Court therefore concludes the term "does not include an amount of a hydrophilic gel-forming bioadhesive agent that increases the viscosity above about 1000 cP at 25º C" should be construed identically to "does not include a hydrophilic gel-forming bioadhesive agent," meaning it "does not include an agent that is hydrophilic, functions to form a gel, and functions as a bioadhesive."

### C. The Mean Area Under the Curve (AUC)$_{0-24}$ of 17β-estradiol of about [X] pg*hr/ml to about [Y] pg*hr/ml

The parties dispute whether the term "mean" in claims 1, 2, 4, and 5 of U.S. Patent No. 10,835,487 (the '487 Patent) refers to the arithmetic (ECF No. 84 at 28) or geometric mean (ECF No. 85 at 25). The arithmetic mean, or the average, is taken by adding a set of data points together, then dividing by the number of points. The geometric mean is to multiplication what the arithmetic mean is to addition. For example, the geometric mean of 2 data points is found by multiplying

them together and then taking the square root, if there are 3 data points you multiply and take the cube root, and so on. (ECF No. 84 at 29; ECF No. 85 at 24.)

Elements of claims 1 and 2 recite the "mean area under the curve $(AUC)_{0-24}$ of 17β-estradiol of about 42 pg*hr/ml to about 63 pg*hr/ml," this precise language appears again in claims 4 and 5, except the range is now "about 16 pg*hr/ml to about 26 pg*hr/ml." '487 Patent col. 58 ll. 20–21, 26–27. Teva contends a POSA reading of the claims would interpret the term "mean" without further qualification to refer to the arithmetic mean. (ECF No. 84 at 28.) TherapeuticsMD disagrees, and argues that a POSA having read the specification, where this language appears verbatim along with "corrected geometric mean," would understand that the same phrase in other claims would likewise refer to the geometric mean. (ECF No. 85 at 25.)

As Teva points out, when ordinary people and scientists alike refer to the mean of a data set, without additional qualifiers, they are typically referring to the arithmetic mean. (ECF No. 84 at 29 (quoting Dawson, Beth, *Basic & Clinical Biostatistics*, Chapter 3 – Summarizing Data & Presenting Data in Tables & Graphs (4th ed. 2004)).) Teva further argues TherapeuticsMD's other patents do expressly refer to the corrected geometric mean, and therefore the court must presume "different claim terms . . . have different meanings." *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1382–83 (Fed. Cir. 2008).

These points are persuasive and lend considerable weight to Teva's preferred construction. "However, no canon of claim construction is absolute in its application." *ERBE Elektromedizin GmbH v. Canady Tech. LLC*, 629 F.3d 1278, 1286 (Fed. Cir. 2010) (quoting *Unique Concepts, Inc. v. Brown,* 939 F.2d 1558 (Fed. Cir. 1991)). "Claim differentiation may be helpful in some cases, but it is just one of many tools used by courts in the analysis of claim terms." *Id.* (citing *Nystrom v. Trex Co., Inc.,* 424 F.3d 1136, 1142–43 (Fed. Cir. 2005)).

Rather than interpret this claim language in a vacuum, TherapeuticsMD urges the Court to read the terms in light of the specification, and the Court agrees. The specification of the '487 Patent contains multiple recitations of the claimed ranges "42 pg*hr/ml to about 63 pg*hr/ml" and "about 16 pg*hr/ml to about 26 pg*hr/ml," and each time refers to them as the "corrected geometric mean area under the curve $(AUC)_{0-24}$." '487 Patent col. 3 ll. 12–14, col. 25 ll. 60–63, col. 26 ll. 26–28. Construing the term "mean" to refer exclusively to "arithmetic mean" misaligns the scope of the claimed invention from all embodiment described in the specification. "[A] claim construction that would exclude the preferred embodiment 'is rarely, if ever, correct' and would require highly persuasive evidentiary support." *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001) (quoting *Vitronics*, 90 F.3d at 1583).

Teva does not cite any intrinsic evidence supporting its preferred construction. Rather, Teva argues the parallels between the claimed "mean" and the specified "corrected geometric mean" should be disregarded to avoid "improperly import a limitation from the specification into the claims." (ECF No. 84 at 30 (internal quotations omitted) (citing *See Cochlear Ltd. v. Oticon Med. AB*, Civ. A. No. 18-6684, 2019 WL 3943014 (D.N.J. Aug. 21, 2019)).) Teva's concerns are misplaced. Construing the claims as referring to the "corrected geometric mean" is not more limiting than if it were the "arithmetic mean." And while *Cochlear* is clear that where "a patentee uses a claim term throughout the entire patent specification . . . with only a single meaning, he [or she] ha[d] defined that term 'by implication,'" there is no dispute the specification of the '487 Patent discusses both the arithmetic and geometric means. *Id.* at *14 (second alteration in original) (quoting *Homeland Housewares, LLC v. Whirlpool Corp.*, 865 F.3d 1372, 1377 (Fed. Cir. 2017). Even so, whenever these specific ranges are discussed in the specification it is uniformly in

reference to the "corrected geometric mean." '487 Patent col. 3 ll. 12–14, col. 25 ll. 60–63, col. 26 ll. 26–28.

The Court therefore adopts TherapeuticsMD's construction that the whole phrase "mean Area Under the Curve (AUC)$_{0-24}$ of 17β-estradiol of about [X] pg*hr/ml to about [Y] pg*hr/ml," from claims 1, 2, 4, and 5 of the '487 patent should be construed together and be read as the "corrected geometric mean Area Under the Curve (AUC)$_{0-24}$ of 17β-estradiol of about [X] pg*hr/ml to about [Y] pg*hr/ml."

### D. Corrected Geometric Mean

Though some of TherapeuticsMD's patents have ambiguous references to the "mean," other patents, namely U.S. Patent Nos. 9,289,382 and 10,806,697, expressly refer to the "corrected geometric mean." Here, the parties agree "corrected geometric mean" should comport to the accepted mathematical definition—"the $n$th root of the product of $n$ observations, adjusted for baseline." (ECF No. 103 at 8; ECF No. 84 at 26 ("There is no dispute regarding the mathematical equation for determining a geometric mean.").) Though Teva does not contest the standard definition of geometric mean, it does ask the court to read alongside earlier language to find that it is the corrected geometric mean of "a single administration to a single patient." (ECF No. 84 at 25.)

This language comes from the beginning of the claims where the term "corrected geometric mean" appears:

1. A pessary comprising about 25 μg of 17β-estradiol in a solubilizing agent comprising a medium chain oil, wherein after *a single administration* of the pessary to *a patient* provides, in *a plasma sample* from *the patient*:

   1) A corrected geometric mean peak plasma concentration (C$_{max}$) of 17β-estradiol of about 19 pg/ml to about 29 pg/ml; and

   2) a corrected geometric mean area under the curve (AUC)$_{0-24}$ of about

21

75 pg*hr/ml to about 112 pg*hr/ml

'382 Patent, col. 56, ll. 2–13 (emphasis added). Teva reads this language as claiming a pessary where a single blood sample, from a single patient, within one administration has geometric mean peak plasma concentration with the claimed range. (ECF No. 84 at 25.) The Court is unpersuaded. Geometric mean is a measure of central tendency, and there is no central tendency within a single data point.

The Court "may not rewrite a claim even . . . [to avoid] a 'nonsensical result.'" *Source Vagabond Sys. Ltd. v. Hydrapak, Inc.*, 753 F.3d 1291, 1301 (Fed. Cir. 2014) (quoting *Chef Am., Inc. v. Lamb–Weston, Inc.,* 358 F.3d 1371 (Fed. Cir. 2004)). "But where, as here, the specification reveals . . . [the] meaning for a term . . . [that] meaning governs, particularly when it also serves to avoid an inoperable claim construction." *AIA Eng'g Ltd. v. Magotteaux Int'l S/A*, 657 F.3d 1264 (Fed. Cir. 2011). Here, no redrafting or special interpretation is required; the Court simply declines to read in additional limitations from elsewhere in the claim where doing so leads to an illogical or absurd result.

Teva argues the geometric mean is applied to "multiple measurements from the same patient," rather than a mean of data from different patients. (ECF No. 84 at 26.) Although TherapeuticsMD agrees pharmacokinetic studies require multiple measurements "collected at various time points post-administration" (ECF No. 85 at 9), this interpretation still fails because it ignores other claim language and clear evidence in the specification that the geometric mean was meant to be calculated across multiple patients. First, were the Court to consistently apply Teva's reading of the claim language, this data would have to come from "a plasma sample," not multiple samples across time, illogically requiring the calculation of the mean of a single data point. '382 Patent, col. 56, 5. Second, even were the Court to set that issue aside, it would not change the fact there is only one "peak plasma concentration" or "area under the curve" from a single

22

administration to a single patient, rendering the claimed corrected geometric mean meaningless. *See Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801 (Fed. Cir. 2021) ("It is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous." (quoting *Wasica Finance GmbH v. Continental Automotive Systems, Inc.*, 853 F.3d 1272 (Fed. Cir. 2017))).

The specification confirms TherapeuticsMD's reading of the claim language. The specification lists 3 pharmacokinetic studies, demonstrating the effectiveness of the claimed invention, the first of which discloses "forty eight (48) subjects who completed the study [and] were included in the primary analysis . . . presented throughout Tables 5, 6, and 7." '382 Patent, col. 49, ll. 35–38.

## TABLE 5

Safety Results: The descriptive statistics for Day 1 plasma estradiol $C_{max}$ and $T_{max}$ are provided below.

| | Estradiol 10 µg | | Placebo | |
| --- | --- | --- | --- | --- |
| | $C_{max}$ | $T_{max}$ | $C_{max}$ | $T_{max}$ |
| N | 24 | 24 | 26 | 26 |
| Mean ± SD | 30.7 ± 7.47 | 2.12 ± 1.73 | 27.5 ± 17.26 | 4.00 ± 2.68 |
| Geometric Mean | 29.9 | — | 24.7 | — |
| Median | 29.8 | 1.00 | 22.1 | 6.00 |
| Min, Max | 19.7, 52.3 | 1.00, 6.00 | 15.1, 90.0 | 0.00, 6.00 |
| CV % | 24.3% | 81.3% | 62.9% | 67.1% |

*Id.* at col. 36 ll. 40 (emphasis added). "Importantly, the person of ordinary skill in the art is deemed to read the claim term . . . in the context of the entire patent, including the specification," and within the specification, the corrected geometric mean clearly refers to the mean of data collected from different patients. *Phillips* 415 F.3d at 1314.

A POSA would therefore understand this as claiming a pessary, which on average provided patients a specific peak plasma concentration and area under curve of β-estradiol after a single

administration, as measured by the geometric mean across patients studied. The Court therefore adopts TherapeuticsMD's construction that the terms "corrected geometric mean" and "mean" carry their plain and ordinary meaning, without constraint to a single patient.

### E. Solvent System

After the stay was lifted, the parties introduced two additional disputed terms, the first of which is "solvent system," which TherapeuticsMD contends refers to "a system of solvent together with other excipients." (ECF No. 180 at 4.) Teva asks the Court to apply the following definition "a composition that solubilizes an active pharmaceutical ingredient." (ECF No. 179 at 9.) Here, the parties have essentially switched positions from their prior interpretations of "hydrophilic gel-forming bioadhesive agent," and Teva now argues for a construction based on the function of the solvent system, whereas TherapeuticsMD maintains that this is purely a structural claim.

The parties agree the first claim of the '487 patent is an appropriate exemplary claim for "solvent system," it recites:

1. A method of treating a female patient with a symptom of vulvovaginal atrophy, the method comprising administering to a female patient in need thereof, an intravaginal softgel insert, the insert comprising:

   a. 10 mcg of estradiol, the estradiol being the only active pharmaceutical ingredient in the softgel insert; and

   b. a liquid solvent system having a viscosity between about 50 cP and about 1000 cP at 25° C., the solvent system consisting of a 9:1 w/w ratio of (i) one or more C6 to C14 fatty acid mono-, di-, or triesters of glycerol to (ii) a nonionic surfactant consisting of PEG-6 stearate, PEG-32 stearate, and ethylene glycol palmitostearate . . .

(ECF No. 179 at 9; *see also* ECF No. 180 at 4.) There is no dispute a solvent system contains "multiple components or ingredients," rather the parties disagree over the scope of what those ingredients may be. (ECF No. 180 at 7; Teva's Second Response Br. (ECF No. 185) at 8.) According to Teva, the "limitless possibility of other excipients" offered by TherapeuticsMD

24

would destroy the narrow scope of the claim denoted by the phrase "consisting of." (ECF No. 185 at 8.)

The Court agrees. It is well understood "consisting of is a closed transition" which "exclude[s] any elements, steps, or ingredients not specified in the claim." *Yoon Ja Kim v. Earthgrains Co.*, 451 F. App'x 922, 926 (Fed. Cir. 2011) (quoting *AFG Indus., Inc. v. Cardinal IG Co.,* 239 F.3d 1239 (Fed. Cir. 2001)). Therefore, a definition of solvent system encompassing unclaimed "colorants" would destroy the limiting claim language TherapeuticsMD itself drafted. (ECF No. 180 at 8.)

In response, TherapeuticsMD cites *Amgen Inc. v. Amneal Pharmaceuticals. LLC*, 945 F.3d 1368 (Fed. Cir. 2020), as binding authority that purportedly requires the Court to construe the claim in such a way that it does not "foreclose[e] additional ingredients" in the solvent system, because the transitional phrase "consisting of" follows the more open-ended transition. (ECF No. 186 at 13.) Teva claims this is an "overread" of *Amgen*. (ECF No. 207 at 6.) According to Teva, *Amgen* stands for the more limited principle that where there is a broad claim covering the "overall composition," which comprises multiple limitations, "reciting a 'consisting of' phrase" the "limitations . . . remain closed, [though] the overall composition does not." Teva makes this distinction clearer by acknowledging "other excipients may be included in [a vaginal] 'insert'" and still practice the patent, only "the solvent system is closed." (*Id.*)

*Amgen* did not change the well-understood rules of patent interpretation, rather it provided guidance on how courts should interpret the limiting language of Markush groups as part of broader, open claim. *See Amgen Inc.* 945 F.3d at 1376. "A Markush claim is a particular kind of patent claim listing alternative species or elements that can be selected as part of the claimed invention." *Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp.*, 831 F.3d 1350,

25

1357 (Fed. Cir. 2016). Where the term Markush claim refers to the claim as a whole, "[a] Markush group lists specified alternatives in a patent claim." *Id.* at 1358.

Teva's reading is consistent with binding Federal Circuit precedent. *Amgen* addressed the question of when a claim is "compris[ed]" of a Markush group of alternative "binders and disintegrants," if the presence of an "additional . . . functionally similar [component,]" to the Markush group would defeat a claim of infringement. *Amgen Inc.* 945 F.3d at 1379. The Federal Circuit held that since the overall claim "uses a 'comprising' transition phrase" one may still infringe the patent "when an accused product contains a component that is from the Markush group and that meets the limitation's requirements." *Id.* Put more simply, if a patent claims at least elements (A), (B), and (C)—where (C) is one of three options—an accused product that contains (A), (B), (C), and (D) still infringes, even if (D) serves a similar purpose to the options in (C). *Id.* But if the accused product only contains (A), (B), and (D), it would not infringe, unless it fell under the doctrine of equivalents or similar doctrine. *Id.*

The circumstances of *Amgen* differ in two parts. First, though "[n]o precise linguistic formula is required to create a Markush claim" or group, there is little doubt the claim at issue does not qualify. *Id.* at 1357 n.2. The term "liquid solvent system" may have two claimed subparts, but these parts are not alternatives to each other. '487 patent col. 57 ll. 51–65. Indeed, it is clear from the plain meaning of the claim, both elements must be present in the "solvent system . . . [in] a 9:1 w/w ratio," rather than as a list of two alternative elements. *Id.* Second, unlike the additional "binders and disintegrants" in *Amgen*, 945 F.3d at 1379, the additional "other excipients" at issue include "surfactants, lubricants, antioxidants, colorants, and preservatives." (ECF No. 180 at 8.) Of these, only the surfactants are arguably "functionally similar" to elements of the solvent system. *Amgen Inc.* 945 F.3d at 1379. The specification, again, provides guidance, as it shows the first

26

element, the "esters of glycerol" are "solubilizing agents," whereas "PEG-6 palmitostearate," and other stearates, play multiple different roles, reducing the surface tension of the system, i.e. being a "surfactant," is "capable of dissolving or solubilizing relatively high amounts of hydrophobic drug compounds," and acting as "a thickening agent."'487 Patent col. 15–17 ll. 48–25. None of these are "functionally similar" to the "lubricants, antioxidants, colorants, and preservatives" present in the tablet TherapeuticsMD seeks to have covered as part of the "solvent system." (ECF No. 180 at 8.) *Amgen*'s relevance is only for the point that claim 1 of the '487 Patent may still be infringed by inserts which contain other excipients—an issue the parties do not actually contest. (ECF No. 207 at 5); *see also Karlin Tech., Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 972 (Fed. Cir. 1999) ("[L]imitations stated in dependent claims are not to be read into the independent claim from which they depend . . .").

For this reason, the Court will interpret the phrase "dependent claims are not to be read into the independent claim from which they depend.").consisting of" as a traditional closed transitional phrase. Though TherapeuticsMD does not go so far as to claim that the presence of the preceding "comprising" language negates the meaning of the closed "consisting of" transition, it does argue the solvent system should be permitted to cover additional components outside the closed claim language. (ECF No. 186 at 9.) But the Federal Circuit is clear, "use [of] the phrase 'consisting of' . . . creates a very strong presumption that that claim element is closed and therefore excludes any [other] elements." *Shire Dev., LLC v. Watson Pharms., Inc.*, 848 F.3d 981, 984 (Fed. Cir. 2017) (internal quotation omitted) (*citing Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp.*, 831 F.3d 1350, 1368 (Fed. Cir. 2016)). "[T]o overcome the exceptionally strong presumption that a claim term set off with 'consisting of' is closed to unrecited elements, the

27

specification and prosecution history must unmistakably manifest an alternative meaning." *Id.* at 1359.

TherapeuticsMD appears to contend, though does not expressly state, that because the patent specification "expressly contemplates the presence of other excipients" it is an unmistakable manifestation of an alternate meaning. (ECF No. 186 at 9.) To support its interpretation, TherapeuticsMD emphasizes a line of the specification discussing how in the "embodiments, the solvent system that solubilizes the estradiol are medium chain fatty acid-based solvents, together with other excipients." '487 Patent col. 13 ll. 12–19; *see also* '709 Patent col. 13 ll. 10–17. Yet, the very next section of the '487 Patent defining the meaning of "other excipients," shows this is an incomplete account. *Id.* col. 15 ll. 36. The primary "other excipient" discussed in this section is "a surfactant," which "includes PEG-6 palmitostearate and ethylene glycol palmitostearate." *Id.* The second element is the claimed solvent system. *Id.* col. 16 ll. 48. There is, therefore, significant ambiguity as to the meaning of "other excipients" within the context of the specification, and whether those excipients are already represented within the claim language, it does not "unmistakably manifest an alternative meaning," to the standard definition of "consisting of." *Multilayer Stretch Cling Film Holdings*, 831 F.3d at 1368. As to the prosecution history, TherapeuticsMD provides the Court no evidence the history supports its favored interpretation. (*See e.g.*, ECF Nos. 180, 186, 208.) The Court cannot diverge from the well-established understanding of "consisting of" based on limited and ambiguous evidence.

Though other parts of the specification do suggest the term "solvent system" was intended to contain excipients beyond the claimed surfactants, this alone cannot change the plain meaning of the claim terms. "[T]he claims measure the invention. They may be explained and illustrated by the description. They cannot be enlarged by it." *Cont'l Paper Bag Co. v. E. Paper Bag Co.*, 210

28

U.S. 405, 419 (1908) (citing *Yale Lock Mfg. Co. v. Greenleaf*, 117 U.S. 554 (1886)); *see also Brumfield , Tr. for Ascent Tr. v. IBG LLC*, 97 F.4th 854 (Fed. Cir. 2024) (same).

Despite this, the Court does not agree with Teva's proposed construction. Unlike the term "hydrophilic gel-forming bioadhesive agent" above, there is nothing within the claim language or specification which compels a functional reading of this claim, much less one which limits the "solvent system" to "solubiliz[ing] an active pharmaceutical ingredient," without consideration of other excipients—even if those excipients are not themselves part of the solvent system. *See Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341 (Fed. Cir. 2009) ("The patentee is entitled to the full scope of his claims.") (citing *Phillips,* 415 F.3d at 1323.); *see also Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1367 (Fed. Cir. 2001) ("Where the function is not recited in the claim itself by the patentee, we do not import such a limitation.").

Unlike the prior gel-forming claim, there is no term such as "agent" which either party claims to create a functional language. '487 Patent col 58 ll. 20–21, 26–27. Indeed, the remaining claim language pushes against a functional interpretation. The claimed element has language defining the solvent system in terms of its composition, the precise ratio of components, a favored temperature, and a specified range of viscosities—other than being referred to as a "solvent system" there is no other reference to the function of the system, nor language which typically connotes a functional limitation. *Id.*

Teva argues its "proposed construction [does not] transform[] this term into a functional term," but instead "defin[es] an excipient according to its function." (ECF No. 185 at 10.) There is no doubt, even for structural claims, that "it is entirely proper to consider the functions of an invention in seeking to determine the meaning of particular claim language." *See ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1375 (Fed. Cir. 2009). But that does not mean the Court

29

can impose a functional limitation on a structural claim, even where the specific function is uncontested.

Defining "solvent system" as "a composition that solubilizes an active pharmaceutical ingredient" would also run counter to the doctrine of claim differentiation, as it is essentially the same definition given to the term "solubilizing agent." (ECF No. 176 at 2, 12 (defining "solubilizing agent" as "an agent or combination of agents that solubilize an active pharmaceutical ingredient").) Claim differentiation "stems from the common sense notion that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope." *Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1368 (Fed. Cir. 2005) (quotation omitted) (citing *Karlin Tech. Inc. v. Surgical Dynamics, Inc.,* 177 F.3d 968, 971–72 (Fed. Cir. 1999))).

Though the '487 Patent does not contain claim language regarding solubilizing agents, other patents such as the U.S. Patent No. 11,123,283 has claims encompassing both "a solubilizing agent" in claims 1, 8, and 23 alongside a "solvent system" in claim 15. '283 Patent col. 19–20, ll. 2– 45. Even within the '487 Patent, the specification is clear that the "solvent system" includes not only "solubilizing agents," *id.* col. 13 ll. 20–22, but also "non-ionic surfactants" that also serve as "thickening agents," *id.* col. 15, ln. 20–36; *id.* col. 17, ll. 22–25. In order to avoid the solvent system having an identical definition to its individual ingredients, the Court will provide a structural definition of "solvent system" consistent with Teva's position regarding "other excipients."

"The trial judge has an independent obligation to determine the meaning of the claims, notwithstanding the views asserted by the adversary parties." *Exxon Chem. Pats., Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1555 (Fed. Cir. 1995). The Court will therefore apply the following

construction: a "solvent system" is a "composition of non-toxic, pharmaceutically acceptable solvents, co-solvents, and surfactants suitable for vaginal delivery or absorption."

### F.  Shape of a Tear Drop

Finally, the parties dispute the definition of the "shape of a teardrop" which is the claimed shape of the vaginal insert of U.S. Patent Nos. 10,888,516; 11,065,197; 11,116,717; and 11,123,283. The disagreement boils down to a single point. Teva insists a tear drop must have one, whereas TherapeuticsMD believes any shape "having a globular form at one end tapered towards the other end," is a tear drop.

Teva points out, correctly, as constructed, the TherapeuticsMD's definition would encompass shapes that the average person is not likely to draw if asked to draw a tear drop, and which are not shown in the specification. (Teva Second Res. *Markman* Br. (ECF No. 185) at 6.) However, the question is not what the average person expects in a vacuum, but whether the shape would be identified as a tear drop by a POSA. *Markman*, 52 F.3d at 986. Teva points to a series of shapes TherapeuticsMD's expert, Dr. Khan, testified were tear drops as evidence of TherapeuticsMD's unreasonable position. (ECF No. 185 at 6.)



*Figure 1 Tear Drop Shapes in Dispute (ECF No. 185 at 6)*

31

Though Dr. Khan's opinion is extrinsic evidence and is not being considered, the Court finds these shapes instructive as to the parties positions. TherapeuticsMD's attorney argued at the hearing that all of the above shapes are in fact tear drops (ECF No. 206 at 61), whereas Teva contended only "one or two are actually teardrops." (*Id.* at 60). Each of the shapes vary in a number of ways, but all have a globular bottom section, and a narrower, yet rounded top. (ECF No. 185 at 6.) Despite Teva's objections, its own construction would similarly encompass every one of these shapes, so long as the tapered side ended in a point.

This contradiction was evident at the hearing where Teva, at times, appeared to abandon the issue of whether the tear-drops tapered to a point, and instead highlighted that "taper is generally understood to have gradual narrowing," whereas many of these shapes narrow quite suddenly. (ECF No. 206 at 59–60.) Fundamentally, this dispute demonstrates the inherent difficulties of rigidly defining visual information.

Instead, the Court looks to the specification and the purpose of the invention to determine the proper construction. Here, the specification begins with a figure detailing the approximate dimensions of the insert:



*See* '197 Patent Fig. 2. This shape matches TherapeuticsMD's preferred definition, "having a globular form at one end tapered towards the other end," and could fairly be described as possessing the "shape of a tear drop." (ECF No. 180 at 11.) Teva argues this shape is not a reference to the tear drop specifically "in accordance with various embodiments of the invention," and may

32

be "a cylinder with a larger 'cap' section," but is "equally likely to be showing the shape of an avocado or pear as it is a teardrop." (ECF No. 185 at 3.)

First, there is no apparent cylindrical element in the figure. Second, avocados and pears have been considered "tear drop" shapes, and the terms are sometimes used interchangeably. *See e.g. Optical Disc Corp. v. Del Mar Avionics*, 45 F. App'x 887, 889 (Fed. Cir. 2002) (noting that heating and cooling of a disc resulted in an asymmetric "'pear-shaped' or 'teardrop-shaped' surface"). Therefore, a POSA would likely interpret the claimed shape to be referring to an insert matching this figure, even with the potential ambiguity of the specification.

To TherapeuticsMD, the claimed tear drop shape should be read in light of its therapeutic intent, the insert's "shape[ must] be suitable for insertion into the vagina" of people specifically prone to vaginal discomfort—a pointed shape would not be suitable for this purpose. The '197 Patent col. 18–19 ll. 66–2. Teva agrees a tear drop suppository with "a sharp end would be impractical," so the tapered end would be rounded "so that it would not be dangerous or uncomfortable for the patient." The parties therefore agree a tear drop with a rounded, tapered end is appropriate, and, despite Teva's objection, the Court cannot discern the practical difference between a shape that tapers to this rounded point and TherapeuticsMD's definition.

The Eastern District of Pennsylvania faced a similar claim construction of a "generally tear drop shape" element of a surgical device in *Bausch & Lomb Inc. v. Moria S.A.* 222 F. Supp. 2d 616, 653 (E.D. Pa. 2002). The Pennsylvania Court determined "the claim is not limited by a pointed top," so long as it has "a globular form at the bottom, tapering to a narrower portion at the top." *Id.*

The Court agrees and therefore adopts TherapeuticsMD's construction that the "shape of a teardrop" carries the plain and ordinary meaning "having a globular form at one end tapered

33

towards the other end." In adopting this definition, the Court makes no determination as to the credibility of Dr. Khan's opinions or whether all the shapes he testified constitute tear drops, in fact, qualify.

## IV.    CONCLUSION

For the reasons set forth above, the Court defines the claim terms as follows: (1) "Does Not Include a Hydrophilic Gel-Forming Bioadhesive Agent" shall mean "does not include an agent that is hydrophilic, functions to form a gel, and functions as a bioadhesive;" (2) "Does Not Include an amount of a Hydrophilic Gel-Forming Bioadhesive Agent that Increases the Viscosity Above About 1000 cP at 25º C" shall be interpreted to share the same definition as "does not include an agent that is hydrophilic, functions to form a gel, and functions as a bioadhesive;" (3) the "Mean Area Under the Curve $(AUC)_{0-24}$ of 17β-estradiol of about [X] pg*hr/ml to about [Y] pg*hr/ml" shall mean "corrected geometric mean Area Under the Curve $(AUC)_{0-24}$ of 17β-estradiol of about [X] pg*hr/ml to about [Y] pg*hr/ml," (4) "Corrected Geometric Mean" shall carry its plain and ordinary meaning, without constraint to a single patient; (5) "Solvent System" means a "composition of non-toxic, pharmaceutically acceptable solvents, co-solvents, and surfactants suitable for vaginal delivery or absorption;" and (6) "Shape of a Tear Drop" shall carry its plain and ordinary meaning, of a shape with a globular form, tapering toward the other end.

Date: January 8th, 2026                                    /s/ Brian R. Martinotti
                                                          **HON. BRIAN R. MARTINOTTI**
                                                          **UNITED STATES DISTRICT JUDGE**